Filed 7/5/24  P. v. McCowan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049125 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1514950) |
| v. | |
| WILLIAM TRACY McCOWAN, | |
| Defendant and Appellant. | |

A jury found William Tracy McCowan guilty of 44 counts of sexual abuse, perpetrated against a single teenage victim during the span of about two years.  The trial court imposed 44 consecutive upper term sentences, totaling 430 years when combined with a middle term sentence for attempting to dissuade a witness from reporting a crime. In this direct appeal, McCowan raises multiple theories by which he contends his trial counsel was ineffective.  Further, McCowan contends that certain of the sexual abuse counts were unsupported by substantial evidence.  Finally, McCowan challenges the imposition of consecutive upper term sentences, under both new sentencing legislation and Penal Code section 667.6.  We conclude that three of the counts were unsupported by substantial evidence and that resentencing is required in light of intervening changes in sentencing law, but we reject McCowan's broader challenges to the verdict. Accordingly, we will reverse the judgment and remand for resentencing.

## I.    BACKGROUND

### A.    *The Information and First Trial*

In July 2015, the Santa Clara County District Attorney charged McCowan with (1) 20 counts of sexual penetration by force, violence, duress, menace, or fear of bodily injury of a minor 14 years of age or older (Pen. Code, § 289, subd. (a)(1)(C)[1]; counts 1 through 20); (2) 12 counts of rape by force, violence, duress, menace, or fear (§§ 261, subd. (a)(2), 264, subd. (c)(2); odd-numbered counts 21 through 43); and (3) 12 counts of oral copulation by force, violence, duress, menace, or fear (former § 288a, since renumbered as § 287, subd. (c)(2); even-numbered counts 22 through 44).  After McCowan was held to answer on all charges of the complaint, the information added a count for attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1); count 45).

In the first trial, a jury found McCowan guilty of attempting to dissuade a witness from reporting a crime but deadlocked as to the other counts.

### B.    *The Evidence on Retrial*

The prosecution case centered on the testimony of Julie Doe and text messages between Doe's mother and McCowan about Doe's allegations that McCowan regularly sexually assaulted her for about two years beginning in the fall of 2012. The defense challenged Doe's credibility, disputing any sexual contact by McCowan, who testified at trial.

Doe met McCowan, a personal trainer, through the younger of her two older brothers.[2]  Doe's brother, who came to consider McCowan a father figure, started training with McCowan in sixth grade and continued until his senior year of high school.  Doe, a

---

[1] Undesignated statutory references are to the Penal Code.

[2] Unless otherwise specified, references to Doe's brother are to the younger of the two brothers.

year younger, initially tagged along and by middle school was training with McCowan herself to improve her skills in track and basketball. McCowan facilitated her admission to a private high school by recommending her to the basketball coach.

Doe ended the coaching relationship early in her junior year. In the spring of her junior year, responding to her mother's encouragement to resume training with McCowan, Doe told her mother that McCowan had raped her. But Doe asked her mother to keep the information secret.

### 1. *Text Messages Between McCowan and Doe's Mother*

Following this revelation, Doe's mother texted McCowan, accusing him of "forc[ing] [Doe] to have sex with [him] . . . [¶] . . . many times" and "[taking] away her life." McCowan replied, "I know that. [¶] I told her when she turned 18 years old I will set up a trust fund for her and take care of her financially for the rest of her life," but he also acknowledged that "[i]t's not going to fix what happened" and "money can't take the pain away." McCowan and Doe's mother continued corresponding in this vein for several days.

The evidence before the jury included screenshots of text messages provided by Doe's mother and deleted texts law enforcement recovered from McCowan's phone. In the recovered texts, McCowan variously repeated "I'm sorry … I'm sorry … ," "I'm sorry ………… ," "I'm sorry ……….. " (ellipses his), acknowledged that he "will rot in prison," estimated how much money he would be able to put in the trust fund over time, and offered, "If you don't lock me up… I will stay out of your life I will stay out of her environment… [¶] I will. Have that trust for [the] rest [of] my life and more." The mother's screenshots and the texts that could be recovered from McCowan's phone, however, did not comprise all the messages between the two about Doe's allegations.

### 2. *Doe's Testimony on the Sexual Abuse*

As Doe's coach, McCowan's training style from the beginning was "very loud. Very motivating. High energy all the time." Although Doe generally responded well to

3

his training style, when Doe "didn't listen to him," McCowan began using physical force: "[H]e would pull my hair. Or slap my face. But that was usually . . . when we were . . . alone."

In the fall of Doe's freshman year, when her team doctor recommended massage for her calf pain, McCowan took Doe to his garage studio for a massage. In Doe's telling, the massage initiated a multi-year routine of sexual abuse; in McCowan's, the massage was nonsexual, with Doe fully clothed, but he told her it was illegal because she was under 18 years old.

Doe testified that McCowan—invoking his "research" on the subject and his practice with his own daughters—persuaded her to remove her pants and underwear for the massage. The massage extended up Doe's hamstring and beyond; McCowan eventually put his finger in her vagina. Doe, feeling confused and violated, told him to stop, at which McCowan proceeded to massage Doe's other leg. Driving Doe to basketball practice afterward, McCowan said something to the effect of, "[Y]ou know what happened. So if you're not going to say anything about it, then let's move on." Doe knew McCowan's actions were wrong, but because she "knew that he could make [her] better in basketball," she did not report the abuse.

From that point, McCowan regularly found occasions to repeat the digital penetration—"almost every time" she saw him for training. McCowan couched the abuse as discipline, telling Doe, "[T]his is what happens when you don't listen to me."[3] Later, as McCowan's sexual abuse escalated, he would put his fingers in her vagina to "loosen [her] up."

While Doe was still a freshman, McCowan started using a dildo in the abuse, telling her they "needed to move on to a new means of [making her] listen[] to him."

_____

[3] As an example of her failure to "listen to" McCowan, Doe explained that McCowan would set goals for her to accomplish during open gym basketball games. If Doe failed, then she had not listened to McCowan.

4

Doe recalled McCowan removing the dildo from a black drawstring bag with a red Jordan logo and strapping the dildo over his crotch. Doe resisted physically and verbally, but McCowan forced her legs apart and penetrated her vagina with the dildo. Doe felt she had no choice but to tolerate the abuse: she still felt indebted to McCowan for her admission to the private high school, and she believed an athletic scholarship—the objective of continuing to train with him—was her best opportunity to attend college.

McCowan kept two dildos in the black Jordan bag and from then on used them on Doe almost every time they saw each other until Doe's sophomore year. Doe could not specifically recall all of the times McCowan used a dildo on her because the multiplicity of events all blurred together. McCowan continued to rationalize the sexual abuse as a coaching/disciplinary technique and once anally penetrated Doe with the dildo as punishment for failing to heed his directive to "run a girl over . . . driving to the basket."

McCowan used the same rationale in escalating the abuse in Doe's sophomore year. In his studio, McCowan told Doe to undress. As was by then routine, Doe complied and laid on the floor, but McCowan told her, while putting on a condom, that "using the dildo wasn't working, [so] he had to move on to something else." Doe, never having had sexual intercourse, protested and tried unsuccessfully to resist. McCowan forced Doe's legs open and thrust his penis into her vagina. From then on, McCowan stopped using the dildo and continued having sexual intercourse with Doe almost every time she saw him until at least the end of her sophomore year. He continued to engage in digital penetration as a precursor to intercourse.

Once the abuse extended to sexual intercourse, McCowan also began to "lick [her] vagina or lick [her] boob or lick [her] neck or ears" and "would do one of those almost every time" he had sex with Doe. Doe described one instance in which McCowan, insisting that she wanted it despite her protests, "moved his tongue around [her] vagina."

McCowan also forced Doe to perform oral sex on him in the studio. Doe described one specific instance. McCowan was laying on his back with a condom on and

Doe was on her knees. McCowan repeatedly ordered Doe to suck his penis and threatened to force her to comply. When Doe continued to refuse, McCowan grabbed the back of her head and pushed her head towards his penis, at which point Doe "didn't see the point in resisting anymore." Asked to estimate the number of times McCowan compelled her to orally copulate him, Doe said, "I would say about seven to ten times maybe at the most."

### 3. *The End of the Coaching Relationship*

In the fall of her junior year, Doe was on the varsity basketball team but was neither improving nor getting playing time. Doe testified that McCowan was again having intercourse with her as she thought to herself, "[W]hat's the point to continue . . . what was happening . . . ." As she described it: "I just remember thinking, like how did I get here? Or why did I put myself in this situation? And I just wanted it to stop." Doe believed that "if [she had] just listened to [McCowan] and, like did better in basketball then none of this would have happened." After McCowan ejaculated into the condom, Doe "knew that [she] wasn't going to continue this." Doe from that point ignored McCowan's texts to schedule further training sessions.

McCowan's description of the end of the coaching relationship differed. McCowan initially testified that he stopped training Doe as a disciplinary tactic: Doe "was telling [McCowan] stuff about her and other girls [at the high school]. And [McCowan] just basically told her if [she didn't] stop what [she was] doing, [he was] done." There were times that McCowan suspended training because of Doe's "behaviors" during training.[4] Prior to his arrest, Doe intermittently asked him to train

---

[4] The defense elicited testimony from Doe's brother that it was "common" for Doe to "act out" during McCowan's training sessions. A.C., who had been married to McCowan during the events in question, testified that she had seen Doe give McCowan attitude like "a normal teenager." Further, McCowan testified that Doe acted jealous of other female clients whose athletic abilities impressed him and of A.C.

her. McCowan testified that he told Doe he would resume her training only if she "stayed focus[ed] . . . and [did] exactly what she was doing before." Later, McCowan inconsistently testified that Doe quit due to another female client, his "only dominant [B]lack track athlete."

### 4. *Doe's Delay in Reporting the Sexual Abuse*

Doe testified that after she ended the coaching relationship, McCowan dissuaded her from reporting the abuse by telling her that his mother was sick. Doe also knew that McCowan had a four-year-old daughter at the time, and Doe did not want "his daughter to grow up without a father like [Doe] did." And during Doe's junior year, McCowan texted Doe, "I will find you," which in context she perceived as a threat to harm her or her family to dissuade her from reporting his conduct.

It was in the spring of Doe's junior year that she first reported the sexual abuse to her mother. Despite communicating with McCowan about the allegations, Doe's mother honored Doe's request "to keep quiet about it because [Doe] didn't want anyone knowing what had happened to [her.]"

The next summer, Doe reported the sexual abuse to her brother during an argument. Her brother testified that Doe became uncharacteristically emotional and told him only that she had been raped, abruptly ending the discussion.

The next day, Doe told her brother that it was McCowan who raped her and that it had been happening for a long time. Doe's brother went alone to a police station and reported the abuse.

### 5. *McCowan's Dildos and Disposable Gloves*

The prosecution presented evidence circumstantially corroborating Doe's recollection of certain details. A.C. testified that she had been married to McCowan at the time of the alleged abuse, although they did not cohabit. She testified that McCowan kept dildos, one of which had a strap, in a black Jordan bag he stored in a walk-in closet in his residence. A.C. had never seen Doe come inside McCowan's residence—unlike

7

his garage studio—and was unaware of any opportunity Doe would have had to find the dildos in the closet. Law enforcement also recovered gloves consistent with those Doe described McCowan using to dispose of condoms in his studio.

McCowan acknowledged that he kept strap-on dildos in a black Jordan bag as Doe described. McCowan surmised that Doe might have seen the dildos by looking through his bag in the van or entering his bedroom to use the bathroom. McCowan later acknowledged that he did not store the dildos in the van and that, when transporting them, "[t]hey would be buried under stuff in the back seat." And McCowan acknowledged having testified during the first trial that Doe had never been in his house.

### 6. *Expert Testimony*

Clinical psychologist Blake Carmichael, who disavowed any knowledge of the charges, evidence, or witnesses in this case, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS or the syndrome). He described the syndrome as "help[ing] dispel some of the myths or misconceptions people have about the way that kids" up to the age of 18 "can react to being sexually abused." "A lot of the records" that inform the understanding of the syndrome "come from . . . social services." The syndrome is not "meant to determine whether someone is guilty of a crime" but instead "gives a context for understanding what the child is going through."

Carmichael identified five elements of the syndrome: secrecy, helplessness, entrapment or accommodation, delayed and unconvincing or inconsistent disclosure, and recanting or retraction. These elements are not a "checklist" to determine whether a child has been abused. Rather, the syndrome accounts for "why these things can happen, and often do happen for kids who have been sexually abused." In that vein, Carmichael identified several reasons a child who is being abused may feel powerless or trapped in a relationship, preserve secrecy while failing to avoid the abuser, or delay disclosure. Carmichael testified that in his "practice" it is not uncommon "for kids to have told a person and asked that person to keep a secret." Further, Carmichael explained that the

8

amount of emotion a child will demonstrate when making a report "varies" and that it is common for a child who has been abused repeatedly over time to be unable to describe specific instances of abuse.

### 7. *The Defense Witnesses*

Aside from himself, McCowan called six witnesses in his defense: (1) four former clients—H.B., B.E., J.P., and I.P.; (2) the parent of two former clients—M.P.; and (3) his step-daughter—R.W. The former clients and parent testified about their experiences with McCowan as a personal trainer and their observations of his unremarkable interactions with Doe.

One former client, I.P., also described communications with Doe after McCowan's arrest became public. I.P. texted Doe to ask if McCowan ever hurt her. Doe told I.P. McCowan had not. But Doe did send I.P. a text "laughing" about McCowan's arrest. By that time, Doe had told I.P. "that she hated [McCowan] and didn't want to be around him anymore." Doe never told I.P. why she hated McCowan.

McCowan's stepdaughter testified about her observations of Doe during training sessions and Doe's failure to disclose to her anything of concern in Doe's relationship with McCowan.

## C. *The Verdict, Motion for a New Trial, and Sentencing*

The jury found McCowan guilty as charged.

After the guilty verdict, McCowan secured new counsel and moved for a new trial, arguing that his trial counsel had rendered ineffective assistance. Trial counsel testified at the hearing on the new trial motion.

The trial court denied the motion and sentenced McCowan to the upper term for each of the 44 counts, with each count to run consecutively, yielding a total sentence of 430 years in prison.

McCowan timely appealed.

9

## II.    DISCUSSION

We reject McCowan's ineffective assistance of counsel claims—to the extent his counsel's performance could be argued in some instances to have fallen below an objective standard of reasonableness, there is no reasonable probability of a more favorable outcome absent the alleged deficiencies.[5]  But we find some merit in McCowan's challenge to the sufficiency of the evidence for some of his convictions for forced oral copulation.  McCowan will have the benefit of intervening changes in sentencing law upon resentencing.

### A.    *Ineffective Assistance of Counsel*

#### 1.    *Legal Principles and Standard of Review*

As is well established, a defendant claiming ineffective assistance of counsel must show both objectively deficient performance by his counsel and a reasonable probability of a more favorable outcome in the absence of the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).)  "We always start with a presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  (*People v. Ruiz* (2023) 89 Cal.App.5th 324, 329 (*Ruiz*); see also *People v. Stanley* (2006) 39 Cal.4th 913, 954 (*Stanley*) [appellate deference to counsel's tactical decisions].)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  (*In re Neely* (1993) 6 Cal.4th 901, 909.)

The trial court adjudicated several of McCowan's claims of ineffective assistance in his motion for a new trial.  As to those claims, we defer to the trial court's factual findings if supported by substantial evidence and review de novo whether the defendant's Sixth Amendment right to effective assistance was violated.  (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

---

[5] As explained below, we treat McCowan's contention that the prosecutor impermissibly vouched for Doe's credibility as an ineffective assistance argument because defense counsel did not object to the prosecutor's statements below.

On direct appeal, we reverse for ineffective assistance "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); see also *People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*).)

### 2.    *The Defense Theory of the Case*

Consistent with McCowan's denial of any sexual conduct with Doe, McCowan's trial defense was that Doe vindictively fabricated the allegations because she was jealous of McCowan's attention to other female clients and angry that he had decided to stop training her. Trial counsel introduced that theory in her opening statement, elicited testimony from witnesses intended to bolster that theory, and returned to the same theory at the start of closing argument.

Also in closing argument, however, trial counsel offered as an alternative theory that *if* the jury found McCowan and Doe to have had a sexual relationship, then Doe's decisions to continue spending time alone with McCowan and to delay reporting any abuse would suggest any sexual acts were consensual.

On appeal, McCowan faults his trial counsel for (1) arguing consent as an alternative defense and (2) failing to proffer—as evidence of motive to lie—Doe's consensual sexual conduct with other adult men. McCowan's posttrial theory of motive is that Doe falsely accused him because he was threatening to tell her mother about Doe's sexual relationships with others; McCowan contends that trial counsel should also have cross-examined Doe's brother about Doe's sexual relationships and her general capacity to tell lies. We decline McCowan's invitation to " ' "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." ' " (*Stanley*, *supra*, 39 Cal.4th at p. 954.)

11

First, we cannot rule out a rational tactical purpose for trial counsel's decision to present an alternative consent theory in her closing argument.[6] Consent was identified as an element of the offenses in the jury instructions. The jury in McCowan's first trial reported it was deadlocked on the sexual abuse counts, and one of the jurors suggested that an instruction on consent could assist in breaking the deadlock. But the same jury convicted McCowan of attempting to dissuade a witness from reporting a crime. Taken together, these indications from the first trial suggest that consent was a significant issue in the jury's deliberations, despite neither party having argued the point. Given McCowan's text exchanges with Doe's mother, trial counsel may reasonably have feared that the jury would reject McCowan's effort to downplay their significance and find that McCowan had engaged in sexual activity with Doe. Particularly after the first trial, counsel may reasonably have believed that jurors could conclude that Doe's testimony was truthful but only in part—that the two had a sexual relationship (contrary to McCowan's testimony) but that it was consensual (contrary to Doe's).[7] We find this a satisfactory explanation for counsel's decision to argue, in the alternative, that the prosecution had not proven the elements of the most serious charged offenses if the sexual relationship was consensual.

---

[6] This particular ineffective assistance of counsel argument was not raised in the written new trial motion. During the hearing on the new trial motion, trial counsel was asked only whether the consent theory originated with McCowan or anything in his testimony. She confirmed it did not. Accordingly, trial counsel was not asked to testify about her tactical decision to raise the alternative consent argument in closing. So we address whether the record affirmatively discloses that trial counsel had no rational tactical purpose for her election. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.)

[7] In isolation, it is no less plausible that Doe, bent on revenge, mischaracterized a prior sexual relationship as nonconsensual than it is that Doe invented the sexual relationship from whole cloth. Further, in isolation, it is plausible, and arguably easier to reconcile with the text message exchanges, that McCowan denied the existence of a consensual sexual relationship because, Doe being a minor, he knew that even such a relationship was illegal.

12

Second, we do not view as unreasonable counsel's stated concern that the jury might treat evidence of Doe's sexual activity with other adult men, if admitted, as a reaction to what she alleged was McCowan's prior abuse. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) McCowan cites a police interview in which Doe's brother reported that Doe had snuck out at night to have sex with adult men she met through an online dating application and that McCowan had attempted to stop Doe from doing so. But in the same interview, Doe's brother said that the reason Doe was sneaking out to have sex with adult men was to cope with McCowan raping her. McCowan makes much of trial counsel's concession that this potential causal inference presupposes that McCowan abused Doe and that he did so before Doe embarked on sexual relationships with other men: McCowan indeed points to this as proof positive that counsel subjectively believed McCowan to be guilty[8] and allowed her belief to taint her tactical judgment. From this, McCowan's argument presumes that competent trial counsel must both (1) be subjectively convinced of her client's innocence and (2) eschew any litigation tactic that anticipates a jury disbelieving her client and primary defense theory. We accept neither premise as compelled by the right to counsel, and McCowan can offer no authority for either. And to the extent McCowan argues that the theory of motive on which trial counsel relied was less than compelling, he does not show that his preferred theory that Doe falsely accused him because he was threatening to report her consensual adult relationships to her mother would represent a material improvement.

---

[8] We also question McCowan's interpretation of trial counsel's testimony. Asked a leading question by successor counsel, trial counsel agreed that her analysis "presuppose[d] that the molest took place." This answer was coupled with trial counsel's testimony that she believed in McCowan's case and was emotionally invested in securing a favorable result for him based on her interactions with his family. Indeed, trial counsel "absolutely" agreed that it could also be true that Doe was never molested by McCowan but engaged in sexual relationships with other men before fabricating that she was sexually assaulted.

13

Third, we see a satisfactory explanation for trial counsel's tactical decision not to cross-examine Doe's brother about Doe's capacity to lie.[9]

In the same interview in which Doe's brother discussed her consensual sexual relationships with adult men, he said that McCowan "always calls [Doe] a black widow" because Doe "is . . . just like a killer" in that she "has a mentality that . . . if she really wanted to, . . . she'll do anything to . . . get what she wants."[10]  When asked where there was a " [']but['] in there," Doe's brother said, "I have no idea.  Yeah, [Doe] is just . . . sneaky sometimes.  Like she'll do things . . . on the low and no one will know."  But in context, the "sneaky" behavior Doe's brother referenced was Doe's covert liaisons with adult men and her having kept McCowan's abuse secret from McCowan's daughter at McCowan's request.  And Doe's brother explained that although Doe had the "mind capacity" to lie, he believed his sister "100 percent":  Although Doe would sometimes brush off her brother's questions or only obliquely answer, when she disclosed to him McCowan's abuse, she had been "upfront and honest with [him] about things.  . . . . [¶]  . . . . [¶]  . . . . [¶]  But . . . this time [Doe] is just . . . yeah, this is what happened and I don't care about it, but this is what is going to happen.  Like that's [Doe's] mentality about it, is that everything is out in the open now and she doesn't care what happens, but just like it needs to be out there."  Moreover, the brother also attributed Doe's sexual activity with others to her experience of abuse by McCowan.  Trial counsel could reasonably have feared the risk of opening the door to such statements outweighed the

---

[9] In the new trial motion, McCowan did not argue that Doe's brother should have been cross-examined about Doe's capacity to lie or her "mentality" to "do anything" to "get what she wants."  Accordingly, trial counsel was not asked to testify about this tactical decision.

[10] Doe's willingness, or lack thereof, to train hard enough to develop her athletic abilities was the theme of the discussion preceding the question that elicited this response.

marginal benefit of selectively introducing decontextualized excerpts. (See Evid. Code, § 356.)

Trial counsel was entitled to attribute little value to evidence that Doe was mentally competent to lie and reluctant to discuss with her older brother her sexual activity, and to consider damaging the brother's statement that it was McCowan who induced Doe to keep the abuse secret. Moreover, there is obvious risk in opening the evidentiary door for Doe's brother to explain why, despite his own close relationship with McCowan, he so credited his sister's account that he independently reported McCowan to the police. That risk satisfactorily explains trial counsel's decision not to broach the subject.

At bottom, trial counsel developed and argued a theory about Doe's motive to lie. To the extent McCowan contends that counsel implied that he was lying by raising an alternative consent defense, we disagree. The alternative argument was just that, a fallback in case the jury rejected counsel's primary contention that McCowan was telling the truth.

### 3. *Failures to Object*

McCowan asserts several theories of ineffective assistance based on counsel's failure to make certain objections: (1) to foundational testimony from Doe's mother for admitting screenshots of text messages between Doe's mother and McCowan; (2) to the prosecutor's vouching for Doe's credibility in rebuttal argument and appealing to the jurors' sympathies; (3) to the prosecutor's cross-examination of the defense witnesses as character witnesses; and (4) to the prosecutor's adducing and then relying in closing argument on evidence of McCowan's sexual interest in Asian women as a motive for the alleged abuse of Doe. On this record, McCowan has not shown deficient performance as to the first three theories, and as to the fourth—assuming that trial counsel could have

15

secured exclusion of McCowan's sexual attraction to Asian women—he has not shown a reasonable probability of a more favorable outcome had counsel done so.

### a. *Doe's Mother and the Text Messages*

Fundamentally, McCowan contends that trial counsel should have challenged the testimonial competence of Doe's mother and thereby prevented admission of the text message screenshots. But McCowan does not meaningfully account for trial counsel's motion in limine to exclude the screenshots—on grounds including but not limited to the mother's competence to authenticate them. Nor does the appellate record supply a viable ground for barring Doe's mother from testifying. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [where there is no sound legal basis for an objection, the failure to object cannot establish ineffective assistance].)[11]

On counsel's in limine motion, the trial court tentatively admitted the screenshots in conjunction with a review of the prosecution's slides for use in opening statements, noting that to authenticate the texts "all the witness needs to say is that that came through her phone, that's sufficient." Testifying at trial through an interpreter, Doe's mother— who Doe testified had suffered a stroke between the relevant events and the first trial— denied that Doe reported to her that McCowan touched Doe in an inappropriate way and denied having had a stroke, but confirmed that her memory was "not like it was before" and that her "mind or . . . brain wasn't like this [when she was working.]" But shown People's Exhibits 16 through 19, Doe's mother confirmed that these were messages she exchanged with McCowan after learning of "this incident" and before Doe's oldest

---

[11] Similarly, the trial court ruling on the new trial motion was not persuaded that counsel would have been likely to succeed in an effort to prevent Doe's mother from testifying or to prevent the text messages from being admitted on foundational grounds.

brother learned of it.  The prosecutor moved People's Exhibits 16 through 19 into evidence without objection.[12]

On this record, McCowan has not shown a viable basis for trial counsel to have prevented the mother from testifying.  McCowan relies on Evidence Code section 701, subdivision (a)(1), which provides that a witness is incompetent to testify if "[i]ncapable of expressing . . . herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand [her]."  But Doe's mother was plainly capable of expressing herself so as to be understood, even though her answers were at times contradictory.  Because the ultimate credibility of the mother's testimony was a matter of weight and not threshold admissibility, we are not persuaded that trial counsel could have successfully prevented her from testifying.  (See *People v. Sanchez* (2019) 7 Cal.5th 14, 31 [burden is on party who objects to proffered witness to demonstrate incapacity to communicate].)

Nor has McCowan articulated a viable challenge to the adequacy of the mother's testimony as a foundation for the screenshots.  McCowan contends that trial counsel should have objected to the admission of the text messages based on "the considerable gaps in [Doe's mother's] testimony with respect to the provenance of the text" and "the chain of custody of the text messages."  But authentication of a writing requires only " 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' [citation]."  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)  An image may be authenticated " 'by testimony or other evidence "that it accurately

---

[12] In cross-examination, Doe's mother admitted that "a lot" of text messages were missing, explaining:  "I transfer it to the computer.  And I don't know why some of these text messages did not get stored into the computer."  When McCowan testified, he confirmed that he sent the text messages "published by the district attorney" but said that the text messages were incomplete and attempted to explain why he said what he did in the messages.

depicts what it purports to show." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 952 (*Gonzalez*).) " 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Goldsmith*, at p. 267.)

Having participated in the exchange of text messages and having personally saved the screenshots, Doe's mother had the ability to assess whether the prosecution exhibits accurately depicted her exchanges with McCowan. Shown the screenshots, she identified them as messages from McCowan soon after she learned about the incident. No more was required.

### b.     *Prosecutorial Misconduct*

Contending that the prosecutor committed separate acts of misconduct by appealing to jurors' sympathies for sexual assault victims and vouching for Doe's credibility, McCowan concedes that trial counsel did not preserve his claim of prosecutorial misconduct. (See *Hoyt*, *supra*, 8 Cal.5th 892, 942 [requiring timely and specific objection and request for admonition to avoid forfeiture].) So McCowan asks us to review trial counsel's failure to object to the claimed misconduct as ineffective assistance.[13] Because McCowan did not raise trial counsel's failure to object to these comments in his new trial motion, trial counsel was not asked to explain her reasoning. Accordingly, it is McCowan's burden to show there can be no satisfactory explanation for counsel's failure to object. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) He cannot meet

---

[13] McCowan also asks us to exercise our "inherent discretionary authority" to review his claim of prosecutorial misconduct without a contemporaneous objection by trial counsel. Without any suggestion that circumstances inhibited trial counsel's ability to object or the utility of an objection or an admonition, we decline the invitation and review McCowan's claim solely as a *Strickland* claim. (See *People v. Clark* (2011) 52 Cal.4th 856, 960.)

that burden on this record. To the extent the prosecutor's arguments were objectionable, we are not persuaded trial counsel rendered ineffective assistance by declining to object.

### i. *Additional Background*

In his rebuttal argument, the prosecutor noted that the defense in its closing argument "belittles [Doe] and makes fun of her, and uses sarcasm, and demeans her, and calls her crazy. And it talks about her engaging in a quote 'little teenage fantasy' unquote. And that's why [Doe] doesn't come forward. That's why sex assault victims don't come forward because you're going to get attacked. You're going to get called crazy. People are going to call you a liar. They're going to make fun of you. They'll belittle you. Front and center, ladies and gentlemen, that's why they stay quiet. That's why this doesn't get reported, because of exactly what you're seeing here. People don't want to believe that this stuff happens. And it does."

Later, in a lengthy rehabilitation focused on the details of Doe's account, the prosecutor added that if Doe had fabricated the charges, she would have needed to (1) "[f]ool[] the police"; (2) "[t]rick[] the DA into filing charges"; (3) "commit repeated acts of felony perjury"; and (4) "defraud the military," her employer at the time of trial, "to arrange for leave to" testify.[14]

The prosecutor concluded by calling the jury to "hold the defendant responsible for what he did" by convicting him.

### ii. *Vouching*

A prosecutor who " 'places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony' " engages in impermissible

---

[14] We understand the prosecutor's argument about defrauding the miliary to have been based on Doe's affirmative response to being asked if she had to explain to her chain of command "why [she] had to come out here." But Doe gave no indication she would have had to say more than that she was a witness in a criminal trial.

19

vouching.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329 (*Seumanu*); see also *People v. Wright* (2021) 12 Cal.5th 419, 446.)  But " ' "[s]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." ' "  (*Seumanu*, at p. 1330; see also *People v. Perez* (2018) 4 Cal.5th 421, 451.)

The Attorney General argues that the prosecutor did not improperly vouch for Doe's credibility but instead responded to the defense contention that Doe was lying by "point[ing] out the number of times and contexts [Doe] would have had to repeat her lies."  We agree with McCowan that the prosecutor's comments arguably went beyond simply highlighting the times and contexts Doe would have had to lie:  By asserting that Doe would have had to "fool[]" the police, "trick[]" the district attorney, "defraud" the military, and commit perjury, the prosecutor implied that each of those entities believed Doe was not lying.[15]  But these arguments largely reflect inferences reasonably drawn from facts of the record; they do not reflect the prosecutor's personal knowledge or belief.

Even if a meritorious objection could have been made and an admonition obtained, however, counsel is not required to make every meritorious objection.  " '[T]he decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem *and whether objection or other responses would serve only to highlight the undesirable testimony*.' "  (*Seumanu*, *supra*, 61 Cal.4th at p. 1313.)

---

[15] Our agreement with McCowan stops short of his related contention that the prosecutor's statement that Doe would have had to "trick[]" the district attorney into filing charges reflects the prosecutor's own personal beliefs about Doe's veracity.

20

There could be a satisfactory explanation for counsel's failure to object to the alleged improper vouching. The comments at issue here were tangential points made in the prosecutor's rebuttal discussion of the lengths Doe would have had to go to fabricate detailed allegations about repeated acts of sexual abuse that were corroborated by physical evidence, including dildos in McCowan's black Jordan drawstring bag. As the prosecutor framed it, he was responding to a defense theory of the case that required Doe "to be a diabolical, cold-blooded sociopath" and a "criminal mastermind." The core point of this line of argument was to put to the jury whether they believed that the person they had seen testify could have concocted the allegations and then repeated her lies, going so far as "to fake those emotions you saw on the stand." Objecting to the specific comments at issue here would have run the risk of underscoring the number of times and contexts Doe would have had to lie—a fact that McCowan has not disputed is a proper subject for comment—in a way that drove home the prosecutor's broader argument. This risk may reasonably have outweighed the potential benefits, including the prospect of securing an admonition that the jury was required to assess Doe's credibility based on the evidence presented at trial or dissuading the prosecutor from making some of the pertinent comments.

We accordingly reject this ineffective assistance argument.

### iii.     *Appeal to Juror Sympathies*

McCowan contends that the prosecutor, by linking the defense closing argument to why sexual assault victims "stay quiet," appealed to the jurors' sympathies for sexual assault victims generally and thereby invited conviction based on society-wide injustice rather than the facts at hand. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 857 ["[a]ppeals to sympathy for the victim fall outside the range of permissible argument"].) Here too we discern a rational purpose for counsel's failure to object.

Contrary to McCowan's argument, the prosecutor's comments did not "encourag[e] the jury to consider the impact of [the] verdict on a society-wide injustice."

21

Rather, relying on evidence adduced at trial, the prosecutor sought to explain why Doe may have delayed disclosure even though her testimony was true.  The prosecutor had adduced Carmichael's expert testimony explaining why child victims of sexual abuse may maintain secrecy or feel helpless.  Among the reasons given were that "people are going to really get mad at you" and that the child may feel like "they won't be believed" in comparison to a "more sophisticated" adult.  While the prosecutor did not limit his comments specifically to child victims, there was at least some evidentiary basis for the prosecutor to invoke the behaviors of other sexual assault victims to explain Doe's delayed disclosure.

McCowan's reliance on *United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1153 is misplaced.  There, the Sixth Circuit recited the general rule that appeals to the jury to act as the community conscience are not per se impermissible unless "calculated to incite the passions and prejudices of the jurors." (*Id*. at p. 1151.)  But " '[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.  The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.  Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem.  The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.' " (*Id*. at p. 1153.)  In *Solivan*, the Sixth Circuit held that "the prosecutor's appeal to the jury to convict a defendant as a blow to the drug problem or to send messages to drug dealers" was "highly prejudicial" at a time when the illegal drug trade was "the specific focus of much national attention, concern and fear."  (*Id*. at p. 1154.)[16]  Here, in contrast, the prosecutor urged the jury to convict McCowan to "hold

_____

[16] McCowan also cites *United States v. Barlin* (2d Cir. 1982) 686 F.2d 81.  There, the Second Circuit addressed the assertion that "the government improperly appealed to the jury's passion and emotion in characterizing their job as 'the one occasion on which

[him] responsible for what he did" and not to convict him as a means of generally deterring other perpetrators of unrelated child sexual abuse.

Even to the extent the prosecutor's comments could be understood as an implicit call to convict McCowan in response to "society-wide prejudices against sexual assault victims" or a "defense[] strategy [that] contribut[ed] to a societal problem," a satisfactory explanation can be given for trial counsel's failure to object. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) For example, trial counsel may have recognized that the central thrust of the prosecutor's argument was a permissible response to the defense closing argument, such that objecting would merely invite the prosecutor to repeat the core argument and detail more precisely how trial counsel had deployed gendered stereotypes about sexual assault victims. Thus, trial counsel may simply have concluded that it was not strategically beneficial to object to this rebuttal argument.

### c.      *Cross-Examination of Defense Witnesses*

McCowan argues that trial counsel was ineffective because she failed to object to the prosecution's cross-examination of six defense witnesses—M.P., J.P., H.B., B.E., I.P., and R.W.—as if they had given direct testimony about McCowan's good character.[17]

---

you have a duty to do something about the drug traffic in our community.' " (*Id.* at p. 93.) While the court explained that the comment "appear[ed] designed to divert rather than focus the jury upon the evidence and [did] not belong in summation," it held that any error was not prejudicial. (*Ibid.*)

[17] At trial, the parties disputed whether the defense's direct examination of its witnesses elicited character evidence. Counsel presented their arguments on the issue before the defense called its first witness. Using H.B. as a representative example, trial counsel argued that she would elicit H.B.'s age when she began training with McCowan, the time period in which H.B. trained with McCowan, and H.B.'s observations of McCowan's treatment of Doe as compared to other female clients. The prosecutor acknowledged that the defense was not seeking "an outright, traditional opinion on character or reputation" that "McCowan has a reputation in the community for such and such" or "in my opinion he is such and such." But the prosecutor contended that the purpose of calling witnesses to confirm that, among other things, he treated them appropriately was to demonstrate McCowan's positive character, such that the

We reject McCowan's premise that the prosecution improperly cross-examined these witnesses.  Trial counsel was therefore not ineffective in refraining from objection.[18]

"A defendant in a criminal case is entitled to call character witnesses to testify to his reputation respecting the relevant character trait involved in the offense charged." (*People v. Kramer* (1968) 259 Cal.App.2d 452, 466; see also Evid. Code, § 1102, subd. (a).)  " '[W]hen . . . a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has *knowledge* of events or acts' " that have occurred, provided, for example, that " 'the cross-examiner' " possesses " 'information that reasonably leads' " the cross-examiner " 'to believe that the acts of conduct by defendant have in fact been committed or the reports of their commission have been generally circulated.' " (*People v. Hawara* (2021) 61 Cal.App.5th 704, 713, fn. 8; see also Evid. Code, § 1102, subd. (b).) "The same principles apply when a witness gives character testimony." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173 (*Ramos*).)  For example, a witness that describes a defendant's religious commitment to indicate a positive character trait for nonviolence may be impeached with acts tending to contradict that impression, such as the possession of weapons in a prison environment.  (*Ibid*.)  The "rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1193.)

prosecution should be permitted to cross-examine them on their familiarity with McCowan, including their familiarity with the allegations and text messages in this case. The trial court did not rule on these arguments.  Trial counsel did not thereafter object to the prosecutor's cross-examination.

[18] Although this contention was raised in McCowan's new trial motion, trial counsel was not questioned about her failure to object at the hearing.  Accordingly, we again assess whether there could be a satisfactory explanation for counsel's failure to object.  (See *Mai*, *supra*, 57 Cal.4th at p. 1009.)

First, we reject McCowan's foundational contention that the prosecution cross-examined R.W., I.P., or B.E. as character witnesses. The prosecution did not cross-examine R.W. at all. The prosecution's cross-examination of I.P. was limited to the relationship between Doe and I.P. and one communication Doe made to I.P.—not McCowan's character. While the prosecutor did ask B.E. about his familiarity with the allegations in this case, he did so to open a series of questions about B.E.'s ability to detect indications that an individual is a victim of sexual assault—a line of questioning that targeted his direct testimony that Doe never acted like she was afraid of McCowan. The prosecutor did not ask B.E. any questions about McCowan's character.

Second, although we agree that the prosecution cross-examined M.P., J.P., and H.B. as character witnesses, we conclude that the cross-examination was permissible.

The defense elicited testimony from each of those witnesses concerning McCowan's appropriate treatment of other teenage girls he was training.[19] We are unable to identify a theory of admissibility of their testimony about McCowan's appropriate treatment of other teenage girls aside from its relevance as evidence of a good character trait, specifically that he was "a person who has a good reputation in the community and is appropriate to be around children where he lives and works," as the trial court described it in instructing the jury. The prosecutor's cross-examination on the same character trait, asking whether the witnesses had heard of the allegations in this case and, if so, whether these influenced the witnesses' views, was thus within the proper scope of cross-examination.[20] As the trial court appropriately instructed the jury, "These 'have

---

[19] J.P. and H.B. testified about being trained by McCowan as minors, without incident. M.P. testified about the appropriateness of McCowan's conduct in trainings he observed.

[20] The prosecutor asked both M.P. and J.P. about their familiarity with certain allegations and evidence in the case, and whether revelation of those allegations or evidence changed their opinion about McCowan. The prosecutor stopped examining

25

you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness's testimony." (See *Ramos*, *supra*, 15 Cal.4th at p. 1173.) Trial counsel did not render ineffective assistance by declining to object.

### d. *McCowan's Sexual Interest in Asian Women*

The prosecution elicited testimony from Doe's brother that McCowan had an "extreme[]" sexual interest in "women of Asian descent" and argued in closing that McCowan's attraction to women of Asian descent meant he was attracted to Doe, an Asian American teen who "was becoming a young woman," and that he therefore had a motive to sexually abuse Doe. In connection with McCowan's new trial motion, trial counsel agreed that she should have objected to the prosecutor's assertion that McCowan's interest in Asian women supplied him with a motive to abuse Doe. In denying the new trial motion, the trial court ruled that evidence of McCowan's sexual interest in Asian women would not have impacted the outcome given the strong evidence against McCowan—particularly the text messages and the dildos. We agree with the trial court.

McCowan's two primary arguments regarding evidence of his attraction to Asian women are in tension. On one hand, McCowan argues that his attraction "to adult women of Asian descent has 'no tendency at all to show that he had a motive to commit *sexual assault*.'" (See *People v. Earle* (2009) 172 Cal.App.4th 372, 393.) On the other, McCowan argues that evidence of his attraction to Asian women is "propensity evidence" that is "inherently inflammatory" but stops short of identifying what *criminal* propensity his attraction to Asian women would suggests.

---

H.B. upon confirming that she was not familiar with the text messages introduced into evidence.

26

McCowan's first argument cuts against his contention that the prosecutor's reliance on McCowan's attraction to Asian women was prejudicial. The prosecutor's argument is at best a more specific variation on arguing that McCowan, being attracted to women generally, was attracted to a specific underage woman and thus had a motive to act on that attraction in spite of her age and objection. Comparing this tenuous argument to the weight of the evidence marshaled against McCowan, we think it implausible that the prosecutor's motive argument, or the underlying evidence on which the prosecutor relied, tipped the scales.

### 4. *CSAAS*

McCowan argues that trial counsel mismanaged the prosecution's use of CSAAS evidence. According to McCowan, Carmichael's testimony amounted to a case-specific opinion, included improper and confusing statistical testimony about the frequency with which certain reporting behaviors are observed, and wrongly asserted that all of the children included in CSAAS studies truthfully reported being abused. Accordingly, McCowan challenges trial counsel's threshold decision not to cross-examine Carmichael[21] and argues that the decision "likely . . . bolster[ed] the impact of [his] testimony" by failing to "get[] in . . . the last word" and implying "a concession that the CSAAS theory applied to" this case "completely and without qualification." McCowan also contends that trial counsel should have called a competing CSAAS expert to "ensure[] that the jury fully understood that CSAAS merely describes common behaviors by children who have reported sexual abuse, that it is not intended to verify the truth of allegations, and indeed, that the children who are the subject of the theory's underlying

---

[21] Trial counsel instead sought to minimize the relevance of Carmichael's testimony. In her closing argument, trial counsel argued that Carmichael's testimony was not based on any interaction with Doe or assessment of the evidence in this case. Trial counsel contended that CSAAS merely provides "factors to look at" and disputed whether certain of the factors were satisfied in this case.

academic studies have not necessarily had the truth of their allegations vetted in a manner that is reliable in a legal sense." And McCowan faults trial counsel for failing to ensure that CALCRIM No. 1193 was read immediately after Carmichael concluded his testimony and not merely before jury deliberations.

Relatedly, McCowan argues that trial counsel was ineffective because she did not object to the prosecutor's statement in closing argument that Carmichael's testimony "about the syndrome . . . was like he was describing [Doe]. It was like he was talking about this case." McCowan concedes that the prosecutor was permitted "to contend that [Doe's] conduct was not inconsistent with the generic CSAAS elements" but asserts that the prosecutor "misapplied the CSAAS theory to . . . vouch for [Doe's] credibility."

"Trial courts may admit CSAAS evidence to disabuse jurors of . . . commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *id.* at p. 175; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*) ["It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused"].)

Preliminarily, we believe trial counsel's general approach to the syndrome evidence reflects a tactical judgment. Cognizant that the testimony about CSAAS would likely be admitted for the limited purpose of evaluating Doe's credibility (see *Lapenias*, *supra*, 67 Cal.App.5th at pp. 171, 175), trial counsel appears to have settled on the strategy of downplaying the evidence by underscoring the limitations on Carmichael's testimony in closing argument—that it was not based on "anything that had to do with

28

this case"—and otherwise relying on the properly administered CALCRIM No. 1193 instruction. Refraining from interposing objections, conducting cross-examination, or calling a competing expert are all consistent with such a strategy. Even if this were not a satisfactory explanation for each of counsel's challenged decisions in connection with CSAAS (see *Mai*, *supra*, 57 Cal.4th at p. 1009), the alternative approaches favored by McCowan did not have a reasonable probability of yielding a more favorable outcome. Even if we assume that trial counsel's methods of dealing with the syndrome evidence were not a rational tactical choice and instead fell below an objective standard of reasonableness, McCowan has not shown a reasonable probability of a more favorable outcome absent the deficiency. (See *Ruiz*, *supra*, 89 Cal.App.5th at p. 329 [legal standard].)[22]

First, taking additional measures to underscore that CSAAS, as McCowan puts it, "is not intended to verify the truth of allegations, and indeed, that the children who are the subject of the theory's underlying academic studies have not necessarily had the truth of their allegations vetted in a manner that is reliable in a legal sense," would not have appreciably blunted Carmichael's testimony.

Carmichael's testimony was not presented as a means of verifying the truth of Doe's allegations. Carmichael testified that CSAAS is not meant to determine whether abuse occurred in a given case. Rather, he stated the purpose of his testimony was to caution against inferring from certain behaviors—without considering the context of those behaviors—that no abuse occurred. In the prosecutor's closing argument, the purpose of that testimony was to rebut the defense theory that Doe's conduct—continuing

---

[22] Although McCowan raised trial counsel's management of the CSAAS issue in his new trial motion, trial counsel was not questioned about the issues at the hearing. The trial court concluded that if these issues constituted irregularities, and the prosecutor's discussion of CSAAS during closing argument was inappropriate, those issues did not impact the outcome given the weight of the evidence connecting McCowan to the crime.

to spend time alone with McCowan, failing to seek help while the abuse was occurring, and failing to promptly report the abuse—undermined her credibility. Because the testimony was properly limited in scope, merely underscoring that proper scope of Carmichael's testimony by cross-examination, a defense expert, or an earlier CALCRIM No. 1193 instruction would have been cumulative.

McCowan's challenges to snippets of Carmichael's testimony do not demonstrate that the testimony exceeded its proper scope, so even if counsel had adopted a more aggressive approach to CSAAS evidence generally those aspects of the testimony would not have been excluded.

Citing *Bowker*, McCowan argues that the defense should have objected when the prosecutor asked if it would be "part of th[e] syndrome" for a child to "disclos[e] abuse to a family member . . . but ask[] that it remain private." Carmichael testified it was not "necessarily about the syndrome" but that it "can happen." In *Bowker*, the court stated that CSAAS evidence is admissible for the sole purpose of "showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) The expert testimony here falls within those parameters.

McCowan has not articulated how challenging the population used to study CSAAS would have had a strategic benefit at trial. McCowan notes Carmichael's testimony that "we know" that the children used to study CSAAS "have been abused" on the basis of physical findings, medical findings, perpetrator confessions, social services findings, and legal convictions. McCowan argues that trial counsel could have challenged this assertion, particularly on the ground that the basis on which a social scientist determines that abuse has occurred may be a lesser standard than the standard applicable in a criminal trial. Given the limits on how the prosecution used Carmichael's testimony, McCowan has not demonstrated how this line of critique would have meaningfully detracted from Carmichael's testimony.

30

Calling our attention to *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), McCowan argues that Carmichael used statistical figures to encourage a predictive conclusion in this case. In *Julian*, the prosecution expert testified that the rate of false allegations known to law enforcement or child welfare agencies " '*is about as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases.' " (*Id.* at p. 885.) Because the jury was asked to believe whether the child who reported sexual abuse or the defendant was credible, the reviewing court reasoned that "92 to 99 percent probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.)

The statistical figures McCowan highlights in this case are different. Most importantly, unlike the expert in *Julian*, Carmichael did not opine on the frequency of false allegations among children who report abuse but on the frequency of behaviors observed within a population of reporters believed to be truthful. Nor are the percentages Carmichael reported so consistently high as those advanced by the expert in *Julian* or, correspondingly, so suggestive of improper probabilistic inferences. According to Carmichael: (1) "20 percent of kids" promptly report abuse in a matter of days or weeks; (2) "40 to 60 percent of kids" do not report in the first year; (3) "upwards of 60 to 70 percent of kids may not even tell until after they're 18"; (4) 70 percent of kids appear emotionally flat when they report abuse; and (5) "18 to 22 percent of kids will recant or retract their claims of abuse." True, Doe was in the majority described by Carmichael in that she did not report the abuse promptly, but she was in the minority to the extent her brother described her as emotional when reporting the abuse.[23] We do not read Carmichael's testimony about the frequency of delaying disclosure along a continuum of time frames (or of the relative infrequency in the CSAAS cohort of certain behaviors Doe

---

[23] Doe became emotional during her direct examination.

31

happened to exhibit) as inviting an improper inference of Doe's truthfulness, but to dispel the myth that the behaviors Doe shared with some in the CSAAS cohort indicated untruthfulness.[24]

Second, we are not persuaded that trial counsel had a means to undercut the prosecution's use of Carmichael's testimony in closing argument or that excision of the arguably objectionable portion of the prosecution closing argument would have generated a reasonable probability of a more favorable result.

McCowan contends that the prosecutor presented CSAAS as a means to verify whether Doe was abused by arguing that Carmichael's description of CSAAS was "like he was talking about this case." Further, the prosecutor argued that Carmichael gave an "unadulterated opinion about [the] syndrome" without knowing the facts of the case but "sure enough" all of the elements applied to this case, save retraction. We allow that these comments in isolation could be interpreted to suggest that the similarity between Doe's conduct and the CSAAS elements demonstrates that McCowan abused Doe.

But the context mitigates that risk: Immediately before making the challenged comments, the prosecutor introduced CSAAS as addressing adults' misplaced expectations for how children would behave. Immediately after, the prosecutor relied on CSAAS to structure his argument that Doe had reasons to maintain secrecy and delay reporting even though her allegations were truthful.

The prosecutor closed his remarks on the subject by urging the jury to adjust the "lens through which" is viewed "all of the evidence that came in" to account for Doe's perspective. From there, the prosecutor walked through the evidence, highlighting Doe's testimony, corroboration for her testimony in terms of the text messages and the dildos,

---

[24] Even if trial counsel could and should have secured a ruling excluding these percentages, the figures by their own terms lack the predictive potency to suggest that they could have added to the weight of the evidence against McCowan.

32

the absence of a persuasive motive for Doe to lie, and McCowan's demeanor and inconsistencies while testifying.

The prosecutor's proper framing of his arguments about the CSAAS testimony limited the extent to which he could be said to invite misuse of that evidence. Moreover, Carmichael was explicit on the proper limits of CSAAS evidence, and the trial court properly instructed the jury on the limits of its relevance and use. We are not persuaded that McCowan had a reasonable probability of a more favorable outcome had counsel challenged the arguably improper portions of the CSAAS discussion in the prosecutor's closing argument.

### 5. *Cumulative Prejudice*

McCowan argues that even if various instances of deficient performance are not independently prejudicial, there is a reasonable probability that in the absence of trial counsel's accumulated unprofessional errors the result of the proceeding would have been different. (See *People v. Jones* (2010) 186 Cal.App.4th 216, 235.) Above, we have assumed that counsel's representation fell below an objective standard of reasonableness with respect to: (1) the CSAAS evidence; and (2) the evidence of McCowan's attraction to Asian women. We focus our cumulative analysis on those issues. (See *In re Jones* (1996) 13 Cal.4th 552, 583.) Even cumulated, we are not persuaded that there is a reasonable probability these alleged errors impacted the result.

We find the trial court's discussion of the significance of trial counsel's alleged errors insightful. While Doe and McCowan gave conflicting testimony, their credibility was not gauged by their testimony in isolation. Doe's credibility was bolstered by two critical pieces of evidence that trial counsel could do little to undermine—the text message exchange between McCowan and Doe's mother and McCowan's practice of keeping dildos in a black Jordan drawstring bag. McCowan himself struggled to account for this evidence, yielding testimony that was variously internally inconsistent or impeached by his testimony at the first trial: In his telling, he admitted offering to pay

33

Doe's mother to not report him to the police and was unable to explain his deletion of certain incriminating texts, yet he was unworried about the police when meeting the mother; he suspected Doe might have rifled through his dildo bag in his bedroom, but had previously testified she had never been in his home.

The result was that the prosecution was able to show (1) McCowan's opportunity to commit the alleged crimes; (2) his alleged method of committing systematically escalating abuse; (3) his possession of the physical instrumentalities used to commit many of the abusive acts; (4) his admission to Doe's mother that he engaged in improper sexual conduct many times; (5) his efforts to pay Doe's mother for her silence; and (6) his deletion of the facially incriminating text messages from his own phone.

The question for the jury was whether to credit Doe against this backdrop, despite McCowan's contrary testimony. McCowan notably does not contend that trial counsel could have secured exclusion of the CSAAS evidence, only that trial counsel could have marginally limited its efficacy. That being so, the disputed portions of the CSAAS evidence and McCowan's interest in Asian women were of exceedingly limited significance to the jury's core credibility determination. There is no reasonable probability that the result of the proceeding would have been more favorable to McCowan in the absence of trial counsel's cumulated assumed errors.

We are not persuaded by McCowan's contentions that the jury deadlock in his first trial or the ambiguity of Doe's testimony as to the number of times McCowan engaged in certain sexual acts should impact our analysis.

McCowan contends that the mistrial on closely similar evidence indicates that this was a close case. (See, e.g., *Gonzalez*, *supra*, 38 Cal.4th 932, 962 [reasonably possible that the verdict in the second trial would have been different if defendant had presented mitigating evidence, where first trial had a different result and main difference between the two trials was the presentation of mitigating evidence]; but see *In re Richards* (2016)

34

63 Cal.4th 291, 315–321 (conc. opns. of Corrigan, J. & Liu, J.) [disagreeing over relevance of prior hung juries in assessing prejudice].)

We do not read as much in the result of the first trial. As we have explained, consent appears to have been a significant issue in deliberations, because one juror stated that an instruction on consent could help resolve the deadlock. During questioning about potential juror misconduct, one juror volunteered that consent "kept coming up in deliberation" despite neither party having raised it. Two days after replacement of a different juror required deliberations to begin anew, the jury deadlocked 11 to one in favor of guilt. Even though the first jury was unable to reach a verdict on any charged sexual offenses, it did convict McCowan of attempting to dissuade a witness from reporting a crime. To the extent McCowan invites speculation about the reasons for the deadlock, such speculation points more readily to the lone holdout juror having been persuaded that McCowan falsely denied a sexual relationship with Doe (necessitating the witness dissuasion) but maintaining reasonable doubt as to consent—the issue that McCowan contends his counsel should not have argued on retrial. But, more fundamentally, the 11-to-one split in favor of guilt combined with the interest in consent persuades us that the outcome of the first trial does not assist in assessing prejudice on retrial.

McCowan contends that even if the case against him was strong as to some counts, it was not strong as to the number of times he orally copulated Doe or forced Doe to orally copulate him. While we agree that Doe's testimony, accepted as true, is ambiguous as to the number of times unlawful oral copulation occurred, any weakness in that specific portion of the prosecution of the case bears no relationship to what McCowan characterizes as counsel's deficient performance. Counsel's alleged ineffectiveness related to whether Doe could be believed in her testimony that McCowan ever abused her, not whether parsing Doe's testimony would reach a particular number of

35

specific sex acts. Thus, there is no reasonable probability that counsel's alleged ineffective assistance had any impact on that portion of the case.

**B.** *Sufficiency of Evidence to Support 12 Counts of Oral Copulation*

McCowan does not dispute the sufficiency of evidence as to any particular count of forcible oral copulation but argues that Doe's testimony was insufficiently specific to support all 12 counts. He observes that her testimony about the number of times McCowan forced her to orally copulate him was limited to an approximate range and that her disjunctive testimony about the parts of her body McCowan would lick before raping her was not limited to her genitals. We conclude that the evidence adduced at trial is sufficient to support his conviction for nine counts of forcible oral copulation.

"A judgment must be supported by substantial evidence in light of the whole record." (*People v. Jones* (1990) 51 Cal.3d 294, 313 (*Jones*).) "We ' " ' 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).) "[G]eneric testimony"—testimony that "outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction"—may support multiple counts. (*Jones*, at pp. 314, 321.) But to do so, the testimony must describe (1) "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct"; (2) "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')"; and finally, (3) "*the general time period* in which these acts occurred … to assure the acts were committed within the applicable limitation period." (*Id.* at p. 316.)

36

At issue here are the first two of the *Jones* requirements—whether the testimony about McCowan's forcing Doe to orally copulate him described the number of acts with sufficient certainty, and whether the testimony on the subject of his oral copulation of her adequately differentiated between violations of section 287, subdivision (c) and acts that, though sexual in context and against Doe's will, did not themselves constitute that type of proscribed conduct. (*Jones*, *supra*, 51 Cal.3d at p. 316.)

On performing oral sex on McCowan, when asked, "Do you remember a time when it happened? Do you happen to remember the first time?" Doe replied, "I remember a time." She then described in detail one instance when McCowan forced her to perform oral sex on him. Doe then confirmed, "That's the only time I can remember today." Doe described it as "less common" than the other sexual acts McCowan had her perform. Asked to approximate how often it happened, Doe said, "I would say about seven to ten times maybe at the most."

On McCowan's oral copulation of her, Doe testified, "Sometimes [McCowan] would, before we had intercourse, he would lick my vagina or lick my boob or lick my neck or ears." Asked how frequently he did so, Doe said, "[H]e would do one of those almost every time." Doe testified that she did not remember the first time McCowan orally copulated her, but she described one instance in which McCowan unexpectedly orally copulated her in the context of their then-established sexual "routine."

Doe's testimony, in the context of the other evidence presented at trial and interpreted in the light most favorable to the judgment, establishes with sufficient certainty that McCowan forced Doe to orally copulate him seven times and that he orally copulated her twice. We recognize as well that Doe's testimony leaves open the possibility that he might have done either or both many more times than the prosecution was able to establish. But the trial evidence here does not establish a larger number of occurrences with sufficient certainty.

37

We have no reason to think a victim's testimony describing an act then stating the number of distinct times the act occurred would lack "sufficient certainty." And "details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Jones*, *supra*, 51 Cal.3d at p. 316.) Doe in fact testified that it was hard to remember all the times other sex acts occurred because "it happened so often that they all seemed the same pretty much."

Here, the jury could reasonably construe Doe's testimony that McCowan forced her to orally copulate him "about seven to ten times maybe at the most" to establish the seven times beyond a reasonable doubt. (See *Brooks*, *supra*, 3 Cal.5th at p. 57 [definition of substantial evidence].) But the upper end of a range Doe explicitly qualified as an approximation is too uncertain to dispel reasonable doubt as to the remainder, without any evidence—even a prior statement by Doe—affirming the higher figure without qualification. Accordingly, we conclude that there was sufficient evidence to support seven instances in which McCowan forced Doe to orally copulate him.

In the context of the other evidence presented at trial and interpreted in the light most favorable to the judgment, Doe's testimony establishes with sufficient certainty that McCowan orally copulated her twice. The prosecutor elicited Doe's testimony describing McCowan's licking her—her genitals, breast, neck, or ear—and linking "one of those" acts to "every time" McCowan raped her. And there is no dispute that Doe's testimony supported the 12 counts of rape. But the prosecution must elicit testimony "describ[ing] *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct." (*Jones*, *supra*, 51 Cal.3d at p. 316.) The prosecution could have followed Doe's undifferentiated testimony about McCowan's oral assault, by asking her to clarify the number of times or the relative frequency McCowan put his mouth on Doe's vulva (as opposed to another body part) before raping her. In the midst of

testimony in which Doe was at times understandably emotional, the prosecution elected not to.

Even so, Doe's other testimony provides sufficient certainty that McCowan orally copulated her twice. Doe testified that the specific event she described was not the first time McCowan orally copulated her, and she described McCowan's act with sufficient detail to establish the elements of the offense. This testimony, considered in light of the record as a whole, supports the inference that McCowan orally copulated Doe at least twice. But it does not establish any greater number of occurrences with sufficient certainty.

The Attorney General argues that the jury could "reasonably assume that [McCowan] forcibly put his mouth on [Doe's] vagina at least five times" based on the number of times he raped her. But, leaving aside our inability to rely on what a jury might "assume" in lieu of substantial evidence, the Attorney General offers no reasoned basis to select any number greater than two—other than the difference between the 12 counts of conviction under section 287, and the seven instances Doe could testify with reasonable certainty that McCowan forced her to orally copulate him. We understand *Jones* to require more.

## C.  *Sentencing*

McCowan raises three sentencing challenges, arguing:  (1) the upper term sentences should be vacated and remanded due to recent changes in the law; (2) the imposition of consecutive sentences without the factual predicates under section 667.6, subdivision (d) being found true by a jury violates the Sixth Amendment under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*); and (3) there is insufficient evidence to support the imposition of full consecutive terms. Our reversal of certain of the consecutively sentenced counts entitles McCowan to full resentencing. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 425.) In that context, the trial court "may, as appropriate, revisit sentencing choices such as a

decision . . . to impose an upper term instead of a middle term [citation], or to impose concurrent instead of consecutive sentences [citation]." (*Ibid*.)

As to the upper term sentences, the Attorney General correctly concedes that McCowan is on appeal entitled to retroactive application of Senate Bill No. 567 (2021–2022 Reg. Sess.). (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 (*Flores*).) We need not address whether the trial court would have imposed upper term sentences if it had been aware of its discretion under the later-enacted statute (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391): On remand the trial court shall conduct a full resentencing and apply current law (see *People v. Buycks* (2018) 5 Cal.5th 857, 893), also including Assembly Bill No. 124 (2021–2022 Reg. Sess.).[25]

Because it is relevant to the limits of sentencing discretion on remand, we pass briefly on the section 667.6, subdivision (d) arguments.

"A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) [of section 667.6] if the crimes involve separate victims or involve the same victim on separate occasions." (§ 667.6, subd. (d)(1).) Each of the sexual offenses at issue in this case are specified in subdivision (e). (See § 667.6, subd. (e)(1), (7)–(8).) "In determining whether crimes against a single victim were committed on separate occasions under [subdivision (d)], the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between the crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and

---

[25] Assembly Bill No. 124 amended section 1170 by making the lower term the presumptive sentence when certain conditions exist. (See § 1170, subd. (b)(6); *Flores*, *supra*, 73 Cal.App.5th at p. 1039.) Because we remand for resentencing on other grounds, we do not reach McCowan's argument that a "reasonably thorough investigation would have a distinct possibility of producing mitigating evidence that would support the imposition of a lesser sentence" under section 1170, subdivision (b)(6).

of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d)(2).)

The sentencing judge decides whether crimes against a single victim were committed on separate occasions. (*People v. Catarino* (2023) 14 Cal.5th 748, 753–754 (*Catarino*).) "A finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior.' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1325 (*King*).) "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092; see also *People v. Solis* (2012) 206 Cal.App.4th 1210, 1216–1220 (*Solis*); *People v. Dearborne* (2019) 34 Cal.App.5th 250, 265–266 (*Dearborne*).)

The Sixth Amendment does not prevent states from "constrain[ing] judges' discretion by requiring them to find certain facts before imposing consecutive, rather than concurrent, sentences." (*Oregon v. Ice* (2009) 55 U.S. 160, 164 (*Ice*).) In *Catarino*, which was decided after McCowan filed his opening brief, the California Supreme Court held that "[b]ecause section 667.6[, subdivision] (d) falls within the rationale of *Ice*, its operation does not violate the rule of *Apprendi* and *Alleyne*." (*Catarino*, *supra*, 14 Cal.5th at p. 757.) [26] Accordingly, we reject McCowan's contention that *Apprendi* and

---

[26] After briefing was complete, the United States Supreme Court decided *Erlinger v. United States* (June 21, 2024) 602 U.S. __ [2024 WL 3074427].) There, the court held that Erlinger was entitled to have a jury decide beyond a reasonable doubt whether his prior burglary offenses had occurred on at least three separate occasions, a factual finding that would "increas[e] *both* the maximum and minimum sentences he faced." (*Id*. at p. *8.) Nothing in *Erlinger* contravenes *Ice* or *Catarino*, which relate to consecutive

*Alleyne* require the factual predicates of section 667.6, subdivision (d)—i.e., that each count is based on conduct occurring on "separate occasions"—to be submitted to a jury and found true beyond a reasonable doubt.

In his reply, McCowan argues that *Catarino* does not apply here because the "separate occasions" analysis under subdivision (d) intrudes on the jury's function of determining "the crime, the victim of the crime, and the *number of crimes*." But the jury did just what McCowan said it was required to do, it determined the crimes perpetrated against Doe and the number of crimes. It did not decide whether section 667.6, subdivision (d) applied because it did not decide whether the crimes were committed in "separate occurrences" within the statute's meaning. *Catarino* held that the "separate occurrences" finding is properly made by the sentencing judge. (*Catarino*, *supra*, 14 Cal.5th at pp. 754, 756.)

As to sufficiency of the evidence, McCowan acknowledges that "many of the[] offenses must have taken place on separate occasions" but argues that it is "impossible to say that none of the 44 offenses occurred in close succession."[27] The Attorney General argues that the consecutive sentences should be upheld for two alternative reasons: (1) Doe's testimony indicates that the sexual abuse was so frequent that a reasonable trier of fact could conclude that each offense occurred on a different day, with any other abuse occurring on the same day effectively constituting uncharged conduct; and, (2) to the

---

sentencing, so we must follow *Catarino*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

[27] Although it is not made explicit, the best-case scenario from the defense perspective seems to be that there were 20 separate occasions, of which eight involved only violations of section 289, subd. (a)(1)(C), and 12 included some combination of all three offenses. Indeed, Doe's trial testimony considered in conjunction with the jury's verdict compels the conclusion that there were at least 20 separate occasions, corresponding to 20 separate instances of penetration by foreign object. But Doe's testimony groups some of the 44 sex acts.

42

extent the trial court treated different sex acts occurring in close succession on a given day as separate occurrences, McCowan has not demonstrated that the trial court erred in doing so.

The trial court found that "McCowan had the opportunity to reflect each time he did an act that posed extraordinary harm upon" Doe. This language was taken from the probation report, which the court endorsed as "captur[ing]" the court's thoughts. Elsewhere in the report, the probation officer wrote that McCowan "had ample time to reflect upon the wrongfulness of his actions not just [before] each separate occasion, but [before] each separate act, . . . transitioning from one act to another, directing the victim into different areas, laying on the floor in his garage or in his backseat, and/or ordering her into different sexual positions."

The trouble with this mode of analysis, however, is that the generic testimony that the prosecution elicited in reliance on *Jones*, *supra*, 51 Cal.3d 294 to describe the frequency of McCowan's abuse provides little record support for how the probation officer surmised McCowan would have "transition[ed] from one act to another" in a single session of "coaching." "[C]ourts have held, for example, the offenses of placing a finger in the victim's vagina, kissing her genitals and then placing his penis in her vagina were but a single occasion." (*Dearborne*, *supra*, 34 Cal.App.5th at pp. 265–266.) "In contrast, where the offenses are interrupted by the defendant's nonsexual activity, they occur on a separate occasion." (*Id*. at p. 266; see also *King*, *supra*, 183 Cal.App.4th at p. 1325 [affirming determination of separate occurrences where two instances of digital penetration were separated by defendant's looking around uneasily when a car drove by].) In *Dearborne*, the trial court erred in concluding that it was required to impose consecutive sentences absent evidence of a "significant break between" acts. (*Dearborne*, at p. 266; see also *Solis*, *supra*, 206 Cal.App.4th at pp. 1216–1219 [collecting cases].) The Attorney General points to *People v. Irvin* (1996) 43 Cal.App.4th 1063, in which the court reasoned that merely a change of position is

needed to find a reasonable opportunity for reflection, as long as the trial court "clearly explain[s] its reasoning" for so finding "based upon a dispassionate review of the facts." (*Id.* at p. 1071.)  What the sentencing record omits are these facts and the court's review of them as to each "separate occasion" the trial court found.  Because we remand for full resentencing on other grounds, the trial court will have occasion to revisit its decision to impose fully consecutive sentences.  We express no opinion on the Attorney General's alternative contention that each count on which McCowan was convicted flows from sex acts occurring on different days, and that any other acts occurring on the same day were not charged by the prosecution given the frequency of the abuse.

## III.   DISPOSITION

The judgment is reversed.  On remand, the court shall vacate the jury's verdicts on counts 40, 42, and 44 and shall resentence McCowan on the remaining counts under current law.

44

_____

LIE, J.

WE CONCUR:

_____

GROVER, ACTING P. J.

_____

BROMBERG, J.

*People v. McCowan*
H049125